UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA     )
                             )    No. 1:05-CR-57
v.                           )
                             )    *Collier\Lee*
EDWARD PARKS GWALTNEY        )

## REPORT AND RECOMMENDATION

*I. Introduction*

Pending before the court is the motion to suppress, with supporting memorandum of law, filed by defendant Edward Parks Gwaltney ("Gwaltney") on September 16, 2005 [Doc. Nos. 12, 13]. Gwaltney claims his incriminating statements to law enforcement officers during an interview conducted October 27, 2004 should be suppressed because those statements were procured in violation of the Fifth Amendment to the United States Constitution. Gwaltney's motion to suppress has been referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons stated herein, it is **RECOMMENDED** Gwaltney's motion to suppress be **DENIED**.

On May 10, 2005, a three count indictment was returned alleging Gwaltney knowingly received child pornography on a computer [Doc. No.1]. On October 28, 2005, an evidentiary hearing regarding Gwaltney's motion to suppress was held. At the hearing, the government offered the testimony of Scott Barker ("Barker"), a special agent with the Federal Bureau of Investigations ("FBI"), and Gwaltney offered his own testimony.

## II. Evidence Presented at the Hearing

*A. Agent Barker's Testimony*

Agent Barker testified his involvement in the child pornography investigation began after an attorney for Girls Preparatory School ("GPS"), Chris Steger ("Steger"), contacted the United States Attorney's office and reported GPS had found allegedly unlawful images on one of its computers. On the morning of October 27, 2004, Barker met with Steger who showed Barker a copy of the alleged images of child pornography taken from Gwaltney's GPS-issued laptop computer. Barker told Steger he wanted to interview Gwaltney. Later that same day, at the invitation of Steger, Barker, and FBI Special Agent Bruce Harkleroad ("Harkleroad") met with Steger and the GPS headmaster, Randy Tucker ("Tucker"), in Tucker's office at GPS.

At the conclusion of his meeting with Tucker and Steger, Gwaltney was summoned at Barker's request to the headmaster's office. The GPS representative who summoned Gwaltney was unknown to Barker. Barker wanted Gwaltney brought to the headmaster's office in order to avoid having FBI agents walking through GPS. The meeting took place around 3:00 or 3:30 in the afternoon, which Barker understood was after normal GPS class hours. The agents decided to request an interview of Gwaltney at GPS that afternoon because Tucker or Steger indicated GPS intended to terminate Gwaltney's employment and the agents wanted to talk to Gwaltney where and while they knew they could find him. During the hearing, Barker did not recall telling anyone not to tell Gwaltney why he was being asked to come to the headmaster's office.

Barker testified the purpose of the interview was to determine if Gwaltney had an explanation for why his computer contained images of child pornography, not to extract a confession. Barker did not advise Gwaltney of any right to remain silent or right to consult with an

2

attorney because Barker did not think Gwaltney was in custody or under arrest during the interview. The interview was conducted in Tucker's office because it was the office made available by GPS. The agents did not explore whether there were other offices or locations that might have been available for conducting the interview. The agents advised Steger they did not want anyone else present during the interview in order to "be fair" to Gwaltney.

When Gwaltney entered Tucker's office, both agents were positioned on one side of the conference table located in Tucker's office. Gwaltney chose to sit on the opposite side of the table, which was the side farthest from the door. The door to the office was to the right of the table, and it was shut by Harkleroad but not locked after Gwaltney entered the office. Barker sketched a rough diagram of the room, which was made an exhibit to his testimony.

Only the agents and Gwaltney were present during the interview. At the beginning of the interview, the agents advised Gwaltney they were investigating child pornography found by GPS on his laptop computer and they were offering him an opportunity to explain why the images were on his computer. Barker told Gwaltney if he did not want to answer, he was free to leave. The agents also told Gwaltney they could make no decision about prosecution, and the matter would be referred to the United States Attorney's Office in Chattanooga for a prosecution decision. The agents interviewed Gwaltney for a period of time described as "less than an hour" or about 45 minutes. On cross-examination, Barker agreed he thanked Gwaltney for his cooperation, but Barker denied he said if Gwaltney had not cooperated Gwaltney would have been taken away in handcuffs. Barker does not remember if Gwaltney thanked the agents for not taking him away in handcuffs. Gwaltney was not handcuffed at anytime related to the interview.

### B. Edward Gwaltney's Testimony

Gwaltney was employed as a teacher at GPS for some 16 years. On October 27, 2004, Jim Kreis ("Kreis"), who Gwaltney described as a high-ranking facilities manager at GPS, arrived unannounced at Gwaltney's office prior to Gwaltney's college rehearsal class scheduled to begin at 2:30 p.m. Kreis informed Gwaltney that Tucker needed to see Gwaltney in the headmaster's office. Kreis did not inform Gwaltney of the reason for the meeting. When Gwaltney said he would "be there" in a few minutes, Kreis told Gwaltney he needed to come to the headmaster's office "now."

Upon arriving at the headmaster's office, Gwaltney did not see Tucker, although there were a couple of people in the reception area. Gwaltney did not speak to anybody in the reception area, but went directly into the headmaster's office still thinking he was meeting with Tucker. In Tucker's office, Gwaltney saw two men who identified themselves as FBI agents Barker and Harkleroad and showed Gwaltney their identification papers and perhaps badges. The agents sat at the office conference table, with one sitting on the side closest to the door and the other sitting at the head of the table closest to the door. Gwaltney chose to select a chair opposite agent Barker because he thought it would be "silly" to sit at the far end of the table. The table was located about six to eight feet from the door that was the only exit from the office. Gwaltney also sketched a rough diagram of the room, which was made an exhibit to his testimony. After Gwaltney entered the room, Harkleroad closed the door, and Gwaltney does not know if the door was locked. There was no evidence presented regarding whether the door actually had a lock.

The agents told Gwaltney they wanted to know if he had an explanation for the child pornography found on his GPS laptop computer. Gwaltney testified he was "stunned" to be

4

### B. Edward Gwaltney's Testimony

Gwaltney was employed as a teacher at GPS for some 16 years. On October 27, 2004, Jim Kreis ("Kreis"), who Gwaltney described as a high-ranking facilities manager at GPS, arrived unannounced at Gwaltney's office prior to Gwaltney's college rehearsal class scheduled to begin at 2:30 p.m. Kreis informed Gwaltney that Tucker needed to see Gwaltney in the headmaster's office. Kreis did not inform Gwaltney of the reason for the meeting. When Gwaltney said he would "be there" in a few minutes, Kreis told Gwaltney he needed to come to the headmaster's office "now."

Upon arriving at the headmaster's office, Gwaltney did not see Tucker, although there were a couple of people in the reception area. Gwaltney did not speak to anybody in the reception area, but went directly into the headmaster's office still thinking he was meeting with Tucker. In Tucker's office, Gwaltney saw two men who identified themselves as FBI agents Barker and Harkleroad and showed Gwaltney their identification papers and perhaps badges. The agents sat at the office conference table, with one sitting on the side closest to the door and the other sitting at the head of the table closest to the door. Gwaltney chose to select a chair opposite agent Barker because he thought it would be "silly" to sit at the far end of the table. The table was located about six to eight feet from the door that was the only exit from the office. Gwaltney also sketched a rough diagram of the room, which was made an exhibit to his testimony. After Gwaltney entered the room, Harkleroad closed the door, and Gwaltney does not know if the door was locked. There was no evidence presented regarding whether the door actually had a lock.

The agents told Gwaltney they wanted to know if he had an explanation for the child pornography found on his GPS laptop computer. Gwaltney testified he was "stunned" to be

4

Case 1:05-cr-00057   Document 18   Filed 11/10/05   Page 4 of 12   PageID #: 4

confronted by FBI agents, but did speak to them. The agents did not tell Gwaltney about any rights or opportunities to have a lawyer present, to remain silent, or to make a phone call. They did not tell Gwaltney he was the "target" of an investigation or that they were going to arrest him. The agents also did not tell Gwaltney he was free to leave. Gwaltney testified he did not feel he was free to leave the interview because he was summoned by Kreis to immediately go to Tucker's office on the pretense of meeting with Tucker, who Gwaltney said was the "ultimate authority" with respect to his career, and because there were two agents in the headmaster's office.

While in the headmaster's office, the agents questioned Gwaltney for approximately 45 minutes about the alleged child pornography on his computer and related matters. Upon the conclusion of the interrogation, the agents thanked Gwaltney for his cooperation stating that, because he had cooperated, they did not have to take him away in handcuffs. Gwaltney then thanked the agents.

### *III. Law and Analysis*

If law enforcement officers interrogate a suspect in custody before informing him of his rights to remain silent and to have the presence and assistance of retained or appointed counsel during any custodial interrogation, "*Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the [government's] case in chief." *Oregon v. Elstad,* 470 U.S. 298, 317 (1985). "Custodial interrogation" has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "A suspect is 'in custody' for purposes of receiving *Miranda* protection if there has been a 'formal arrest or restraint on freedom of movement.'" *Mason v. Mitchell,* 320 F.3d 604,

631 (6th Cir. 2003) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977) (per curiam)). "Interrogation" includes both express questioning and its functional equivalent, which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 300-01 (1980). When determining whether police activity constitutes interrogation of a suspect in custody within the meaning of *Miranda,* "courts should carefully scrutinize the factual setting of each encounter of this type." *United States v. Avery,* 717 F.2d 1020, 1025 (6th Cir. 1983), *cert. denied*, 466 U.S. 905 (1984).

It is undisputed the agents questioned Gwaltney without advising him of *Miranda* rights. While Barker disputed his questioning of Gwaltney constituted an "interrogation" on cross-examination, the government conceded, and I find, the questioning at issue constituted an interrogation by law enforcement officers for purposes of the *Miranda* analysis.

The key issue for resolution with respect to Gwaltney's motion is whether the October 27, 2004 interview was a *custodial* interrogation. The Supreme Court recently recognized two discreet inquiries essential to a custody determination: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Yarborough v. Alvarado*, 541 U.S 652, 633 (2004). The Sixth Circuit Court of Appeals ("Sixth Circuit") has held the following factors are relevant to the custody determination: the purpose of questioning; whether the place of the questioning was hostile or coercive; the length of questioning; other indicia of custody such as whether the suspect was told he was not under arrest, told the questioning was voluntary, told he was free to leave or could request the officers do so; and whether the suspect possessed unrestrained

6

freedom of movement, whether he initiated contact or acquiesced to the request to answer questions. *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003).

Questioning an individual suspected of a crime does not render the interrogation custodial. *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.), *cert. denied*, 523 U.S. 1122 (1998) (citing *Mathiason*, 429 U.S. at 495). Custody must be determined based on how a reasonable person in the suspect's situation would have perceived his circumstances, not on the subjective views harbored by either the suspect or the interrogating agents. *Stansbury v. California*, 511 U.S. 318, 320 (1984) (per curiam); *Biros v. Bagley*, 422 F.3d 379, 389 (6th Cir. 2005). The Sixth Circuit employs a totality of the circumstances approach to determine if a suspect was in custody at the time incriminating statements were made. *United States. v. Sivils*, 960 F.2d 587, 597 (6th Cir.), *cert. denied*, 506 U.S. 843 (1992). Where the circumstances of the interview demonstrate reasonable persons would have objectively felt they were free to terminate the interview, there is no *Miranda* requirement. *Yarborough*, 541 U.S at 662-63; *United States v. Warner*, 971 F.2d 1189, 1201 (6th Cir. 1992).

Gwaltney argues the circumstances demonstrate a reasonable person would not have felt free to leave because he was summoned by his supervisors to the headmaster's office under false pretenses for an interview which took place in the headmaster's office during school hours while Gwaltney was required to be at work. According to Gwaltney, his exit from the conference room was essentially blocked by the seating arrangements at the table, he was never told he was free to leave, and a 45 minute interview constitutes a lengthy interrogation because Gwaltney was not able

to teach his college rehearsal class.[1]  Gwaltney argues the comment allegedly made at the conclusion of the interview that his cooperation resulted in his not being taken away in handcuffs also demonstrates he was not free to leave.

The government argues a reasonable person would have felt free to leave because Gwaltney was advised at the beginning of the interview he could leave the interview at any time, advised he would not be arrested under any circumstances at that time, and advised the agents were there to hear his explanation, if he had one, about why there was child pornography on his computer.  The government also argues the length of the interview was short and took place at GPS rather than a police station, indicating Gwaltney was not in custody.

It is undisputed Gwaltney was not placed under arrest or in restraints during the interview.  There is no evidence he was searched, frisked or subject to a patdown.  There is no evidence the agents ever brandished weapons or were physically threatening to Gwaltney.  There is no evidence Gwaltney ever attempted to leave or refused to answer any questions during the interview.  There is no evidence that the physical make-up of the interview room created a hostile environment, and, to the contrary, both sketches of the room indicate a rather spacious office.

The testimony of Gwaltney and Barker contains factual inconsistencies, which is not surprising considering witnesses' memories of events will not always completely match, particularly when they testify a year after the events occurred.  The inconsistencies that warrant discussion herein are:  whether Gwaltney was advised he was free to leave and whether Gwaltney's exit from

---

[1] At the hearing, no evidence was submitted regarding the alleged presence at GPS of an off-duty SWAT officer, although the presence of such an officer was argued to be a relevant factor demonstrating a custodial interrogation in the brief filed by Gwaltney [Doc. No. 13 at 2, 6 ]. As no evidence is before the court regarding the presence of any such officer, the allegation in Gwaltney's brief has not been considered herein.

8

Case 1:05-cr-00057   Document 18   Filed 11/10/05   Page 8 of 12   PageID #: 8

the room was in some way hampered.[2] I find the testimony of Agent Barker to be credible. Barker testified clearly and unequivocally and his recollection of events is supported by his November 1, 2004 report, which was made an exhibit to his testimony. In contrast, Gwaltney testified he was "stunned" by the turn of events at his interview. Given the stressful nature of the circumstances, it is quite possible he does not recall the agents telling him he was free to leave at the beginning of the interview. Regarding Gwaltney's ability to leave, there is no evidence the office door was locked or the exit was actually blocked. Gwaltney chose where he sat based on the available seats, did not attempt to leave, and did not know if the door was locked, and these are factors supporting a conclusion reasonable persons would believe they were free to exit the office if they made a decision to do so.

Based on Gwaltney's testimony, it was concern about his 16-year career that governed his decision to consent to the interview. The custody determination, however, involves a reasonable person standard and not a subjective standard. While reasonable persons might have thought leaving the interview would be a poor career choice, reasonable persons would also believe they were free to choose to leave. In a similar case, *United States v. Crossley*, 224 F.3d 847 (6th Circuit 2000), the Sixth Circuit addressed the issues created when a suspect is interviewed at work. In *Crossley*, the FBI went to a military camp, which was the defendant's place of business, to conduct an interview. The defendant was not informed of the interview ahead of time, was called to the interview during

---

[2] The inconsistent testimony about whether Gwaltney was thanked for his cooperation so he did not have to leave in handcuffs does not warrant discussion herein because it is undisputed any such statement, even if made, was made at the conclusion of the interview and after the incriminating statements were made. Recent case law makes clear that the relevant question for the custody determination is how a reasonable person would have gauged his freedom to leave during, not after, the interrogation. *Yarborough*, 541 U.S. at 663. In addition, for the reasons stated herein, I do not think this inconsistency in the witnesses' recollections undermines the credibility of Barker.

9

the work day, an official at the camp chose the room for the interview, the interview lasted less than an hour, two FBI agents sat on the opposite side of the table where the interview was conducted, the door to the interview room was closed but not locked, the agents never told the defendant she could not leave and never attempted to prevent her from leaving, and the defendant never asked to leave the room or terminate the interview. The defendant argued she was subject to a custodial interrogation because she was unexpectedly summoned to the administrative office and ordered by her military superiors to go to the room where she was confronted by the two FBI agents. Relying on *U.S. v. Mahan*, 190 F.3d 416 (6th Cir. 1999), the Sixth Circuit held the defendant was not subject to a custodial interrogation because reasonable persons would have felt free to leave the interview under the totality of the circumstances. *Crossley*, 224 F.3d at 863. In *Mahan*, the Sixth Circuit also held an employee questioned at work for one hour and 35 minutes was not subject to a custodial interrogation. 190 F.3d at 422. *See also United States v. Protsman*, 74 Fed. Appx. 529, 533 n. 6 (6th Cir., August 26, 2003) (noting that the question of custodial interrogation is not determined on the basis of any one factor, and that police questioning at a suspect's place of work is likely to be less intimidating than questioning in a police station).

Gwaltney relies on *United States v. Sawinski*, 2000 WL 1357491 (S.D. N.Y. September 20, 2000) to support his argument that the circumstances of his interrogation at GPS demonstrate Gwaltney was not free to leave the interview. Gwaltney's arguments are unpersuasive for several reasons. Aside from being an unpublished decision from another jurisdiction, the case does not hold the interrogation was custodial even though it was conducted at the defendant's place of work. *Id.* at *4. The unreported decision merely states the fact a suspect is called by a supervisor during work hours to a lengthy interrogation with law enforcement officers was one factor which supports a

finding that a suspect is in custody, but that even considering that factor, under the totality of the circumstances, a reasonable person would have felt free to leave. *Id.*

Factors I have reviewed when considering the totality of the circumstances include where the interrogation took place, how Gwaltney was informed of the interrogation, the length of the interrogation, what was communicated to Gwaltney about the interrogation, and other circumstances surrounding the interrogation. I find no one factor is determinative in this case, but the factors are strongly in favor of a finding that Gwaltney was not in custody at the time of his interrogation for *Miranda* purposes. After considering the totality of the circumstances, I conclude reasonable persons would have objectively felt they were at liberty to terminate the interrogation and leave, and the circumstances do not support a finding that *Miranda* warnings were required.

It is possible in special circumstances that statements made by persons who are not in custody may be found to be involuntary, and hence inadmissable as a violation of the Fifth Amendment. *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976); *United States v. Bencs*, 28 F.3d 555, 559 n.2 (6th Cir. 1994), *cert. denied*, 513 U.S. 1117 (1995). Gwaltney, through counsel at the hearing, agreed his statements were voluntary and he does not contend the agents did anything coercive in connection with the interview. There is no evidence the agents or others made any threats to Gwaltney, made promises of leniency to Gwaltney, or sought to overbear Gwaltney's free will. In sum, Gwaltney's statements to law enforcement officers were entirely voluntary. Therefore, admission of the statements into evidence would not violate Gwaltney's Fifth Amendment rights.

*IV. Conclusion*

For the reasons explained above, I **RECOMMEND**[3] Gwaltney's motion to suppress [Doc. No. 12] be **DENIED**.

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

12